FILED

JUN 13 2025

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **INFORMATION** |
| Plaintiff, | ) |
| v. | ) CASE NO. **1:25 CR 00295** |
| JULIAN FERGUSON, | ) Title 18, United States Code, Section 1349 |
| Defendant. | ) **JUDGE OLIVER** |

### GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

#### Defendant and Relevant Entities

1.  Defendant JULIAN FERGUSON ("Defendant") resided in East Cleveland, Ohio, in the Northern District of Ohio, Eastern Division.

2.  Bank 1 was a federally insured financial institution headquartered in Charlotte, North Carolina.

3.  Bank 2 was a federally insured financial institution headquartered in Minneapolis, Minnesota.

4.  The United States Postal Service ("USPS"), in addition to providing mail services, the USPS also sold money orders at USPS post offices for amounts up to $1,000 in a single money order.

#### Unemployment Insurance Background

5.  The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system. The UI system provided temporary financial assistance to eligible lawful workers who were unemployed through no fault of their own. The purpose of the UI

system was twofold: to lessen the effects of unemployment through direct cash payments to laid-off workers; and to ensure that life necessities were met weekly while the worker sought employment.

6. State unemployment systems and benefits were joint federal and state enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in the state. SWAs administered UI programs in accordance with federal laws and regulations. Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits were paid. Generally, UI weekly benefit amounts were based on a percentage of a lawful worker's earnings over a base period. When state unemployment benefits were exhausted, the U.S. Department of Labor ("DOL") could supplement them with federal funds.

7. In California, the SWA was the Economic Development Department; in Ohio, the SWA was the Department of Job and Family Services; and in Pennsylvania the SWA was the Department of Employment and Workforce Development (collectively, the "State SWAs"). Other states administered their UI programs through analogous state-run agencies. Regardless of the state, DOL funded each SWA's administrative costs surrounding UI.

8. Because of the COVID-19 pandemic, legislation expanded the State SWAs' ability to provide UI benefits. On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law. The CARES Act expanded the SWAs' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided for new programs, including Pandemic Unemployment Assistance and other programs ("Pandemic UI").

9. To obtain Pandemic UI, an individual could apply online through the State SWAs' respective websites. Applications for Pandemic UI submitted to the State SWAs were routed to servers located outside the State of Ohio. Claimants answered various questions to establish their eligibility, including whether they had performed work in the state in which they were claiming Pandemic UI benefits. Claimants were required to provide personal identifying information, which included their name, mailing address, gender, email, phone number, social security number, and date of birth (collectively, "personal identification information"). Moreover, claimants had to identify a qualifying occupational status and COVID-19-related reason for being unemployed. Claimants could also submit several documents as evidence of their income.

10. Regardless of which of the federally funded Pandemic UI programs was involved, funds were distributed to program participants by the State's respective SWA, after the SWA received the funds from the United States Department of the Treasury. While there were different paths that payments could take from the Treasury Department to a given SWA, all such payments were routed through multiple states and across state lines in interstate commerce.

11. The State SWAs specifically asked Pandemic UI claimants if they were receiving UI benefits from other states on their applications. Claimants were prohibited from collecting UI benefits from more than one state at the same time.

12. The State SWAs used designated banks, including Bank 1 and Bank 2 (collectively, the "Partner Banks"), to administer Pandemic UI benefits. If a State SWA approved a claimant's application, the Partner Bank mailed a debit card to the claimant at the mailing address identified by the claimant on their application, or provided to the Partner Bank. The Partner Bank thereafter loaded benefits on the claimant's card at certain intervals.

## COUNT 1
(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

The Acting United States Attorney charges:

13. The factual allegations contained in paragraphs 1 through 12 of this Information are re-alleged and incorporated as though fully set forth herein.

### The Conspiracy and Scheme to Defraud

14. From in or around May 2020 through on or about December 8, 2023, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JULIAN FERGUSON and others known and unknown to the Acting United States Attorney did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit federal fraud offenses, that is: to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Objects and Purposes of the Conspiracy and Scheme

15. The objects and purposes of the conspiracy and scheme were to: (1) unlawfully obtain Pandemic UI funds from DOL and State SWAs; (2) prevent detection of the conspiracy and scheme to defraud; and (3) divert proceeds for conspirators' use and the use and benefit of others and to further and conceal the conspiracy and scheme.

Manner and Means of the Conspiracy and Scheme

16. It was part of the conspiracy and scheme that:

a. Defendant submitted and caused to be submitted Pandemic UI benefits applications to multiple SWAs, including the State SWAs, in the names of purported applicants, using the personal identifying information of purported applicants, and making and causing to be made materially false statements and omissions on the applications to induce each SWA to approve the applications and issue Pandemic UI benefits, including false statements regarding employment history, residency and other information, and misrepresentations about who was receiving the benefits sought and whether the purported applicant was also receiving UI benefits from another state's SWA.

b. Defendant's materially false statements and omissions on the Pandemic UI benefits applications induced DOL and the State SWAs to issue Pandemic UI benefits to which Defendant and others were not entitled, including in the form of Partner Bank-issued debit cards.

c. Upon receiving the fraudulently obtained Partner Bank-issued debit cards from the SWAs, Defendant used the debit cards to make purchases and cash withdrawals, and also directed coconspirators to make certain purchases and withdrawals for the benefit of Defendant and his coconspirators, thereby obtaining Pandemic UI benefits the conspirators were not qualified or authorized to receive.

Acts in Furtherance of the Conspiracy and Scheme

17. In furtherance of the conspiracy and scheme, and to accomplish the objects and purposes and conceal the existence thereof, a member of the conspiracy committed and caused to be committed, in the Northern District of Ohio, and elsewhere, the following acts, among others:

*SWA Applications*

18. From on or about May 15, 2020, to on or about January 10, 2021, Defendant submitted and caused to be submitted to the State SWAs approximately 95 electronic applications for Pandemic UI benefits in both his own and other individuals' names. The information on the applications concerning the individuals' employment and eligibility to receive unemployment benefits from the State SWAs were false.

19. Defendant's fraudulent applications caused the State SWAs' Partner Banks to send via regular U.S. mail to addresses controlled by Defendant or another coconspirator debit cards in the purported applicants' names (the "Fraudulent PUA Debit Cards"), many of which were unlawfully obtained by the use of other persons' means of identification, even though those persons were not the true recipients of the benefits. The Fraudulent PUA Debit Cards were subsequently loaded with Pandemic UI benefits totaling approximately $1,631,800.

20. Defendant and his coconspirators used the Fraudulent PUA Debit Cards for his own enrichment and the enrichment of the other coconspirators, including, at times, providing one or more of the Fraudulent PUA Debit Cards to another coconspirator for their use and directing coconspirators to make certain purchases or cash withdrawals, thereby obtaining Pandemic UI benefits for which Defendant and the other coconspirators were not eligible and to which they were not entitled, knowing the benefits were obtained under false pretenses.

*USPS Money Orders*

21. From on or about July 7, 2020, to on or about August 7, 2020, Defendant and other coconspirators used Fraudulent PUA Debit Cards to purchase approximately 68 USPS money orders totaling $68,000 at USPS locations in the Northern District of Ohio.

    a.    Defendant caused money orders purchased with at least four Fraudulent PUA Debit Cards to be deposited into Defendant's bank account.

    b.    Coconspirator 1 used a Fraudulent PUA Debit Card to purchase two USPS money orders totaling $2,000. Coconspirator 1 later caused the money orders to be deposited into Defendant's bank account.

    c.    Coconspirator 2 deposited a money order purchased with one of the Fraudulent PUA Debit Cards into her bank account. Defendant later used the same Fraudulent PUA Debit Card to make an ATM withdrawal.

    d.    Defendant caused 39 money orders totaling $39,000, including two money orders that were purchased with a Fraudulent PUA Debit Card in the name of Coconspirator 2, to be provided to Coconspirator 3 to deposit in Coconspirator 3's bank account.

*ATM Withdrawals*

22.    From on or about July 1, 2020, through at least on or about September 23, 2020, Defendant used at least fifteen different Fraudulent PUA Debit Cards to make cash withdrawals at ATMs in the Northern District of Ohio.

23.    On or about August 14, 2020, Defendant and Coconspirator 1 traveled from Cleveland, Ohio, to Atlanta, Georgia.

24.    On or about August 16, 2020, Defendant used Fraudulent PUA Debit Cards to make cash withdrawals at an ATM in Atlanta, Georgia, totaling $4,000.

25.    On or about August 17, 2020, Defendant and Coconspirator 1 used Fraudulent PUA Debit Cards to make cash withdrawals at adjacent ATMs in Atlanta, Georgia, totaling $3,000.

26. On or about August 24, 2020, Defendant and Coconspirator 1 traveled from Cleveland, Ohio, to San Francisco, California.

27. On or about August 25, 2020, Defendant used Fraudulent PUA Debit Cards to make cash withdrawals in San Francisco, California, totaling $4,000.

All in violation of Title 18, United States Code, Section 1349.

CAROL M. SKUTNIK<br>
Acting United States Attorney

By: *Elliot Morrison*
Elliot Morrison
Chief, White Collar Crimes Unit